**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| AMINA SHAHAM,<br><br>  *Plaintiff*,<br><br>  v.<br><br>VERTRAX, INC.,<br><br>  *Defendant*. | No. 3:21-cv-00170 (MPS) |

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Amina Shaham ("Plaintiff" or "Shaham"), proceeding *pro se*, brings this action against Vertrax, Inc., ("Defendant" or "Vertrax"), her former employer, alleging claims of discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq*., as well as state law claims for negligent misrepresentation and negligent infliction of emotional distress. Shaham alleges that Vertrax discriminated against her on the basis of her sex, religion, national origin, and disabilities by preventing her from training some of her clients and by terminating her after an almost one-year leave of absence from her job at Vertrax. Both Shaham and Vertrax have moved for summary judgment. For the reasons set forth below, I grant Vertrax's motion and deny Shaham's motion.

## II. BACKGROUND

### A. Facts

Before reviewing the facts in this case, I must first address the various factual statements filed by the Plaintiff in support of her own summary judgment motion and in opposition to Defendant's motion.

Local Rule 56(a)(1) provides that "[a] party moving for summary judgment shall file and serve with the motion and supporting memorandum a document entitled 'Local Rule 56(a)1 Statement of Undisputed Material Facts,' which sets forth, in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3, a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried."  D. Conn. L. Civ. R. 56(a)(1).  "Such a statement must reference admissible evidence (when presented at trial in the form of testimony or other permissible method) in the record tending to prove each such fact, *e.g.*, deposition testimony, admissions, answers to interrogatories, affidavits, etc., *see* Fed. R. Civ. P. 56(c)(2) (nonmovant may object that cited material is inadmissible); D. Conn. Local R. 56(a)(3) (specific citation to evidence must be to 'the affidavit of a witness competent to testify as to the facts at trial' or to 'evidence that would be admissible at trial')…."  *Jackson*, 766 F.3d at 194.  Plaintiff's "Statement of Material Facts Support Documents to Motion," ECF No. 37-1; *see also* ECF No. 38 at 6-23, filed in support of her motion for summary judgment, does not comply with these Local Rules.  The document is a compilation of medical records; email correspondence with physicians, defense counsel, and Vertrax employees; screenshots of text messages; and a "Chronological Activity List," which appears to be, but is not authenticated as, a record of phone conversations with "United Health[care] Claims Clerk Andrea Doughtry" – all excerpted from their respective contexts.

A party opposing summary judgment must file a "Local Rule 56(a)(2) Statement," "which shall include a reproduction of each numbered paragraph in the moving party's Local Rule [56(a)(1)] Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact…."  D. Conn. L. Civ. R. 56(a)(2)(i).  Under Local Rule 56(a)(3), "each denial in an opponent's Local Rule 56(a)2 Statement[] must be followed by a specific

citation to" admissible evidence, such as an affidavit or deposition testimony.  D. Conn. L. Civ. R. 56(a)(3).  Defendant informed Shaham of these requirements by providing her with a "Notice to Self-Represented Litigant Concerning Motion for Summary Judgment," in accordance with Local Rule 56(b).  ECF No. 44.

Shaham's Local Rule 56(a)(2) Statement in opposition to Defendant's summary judgment motion, *see* ECF No. 46-2,[1] does not comply with the Local Rules.  In her statement, Shaham expresses her disagreement with many of the facts represented by Defendant to be undisputed, but fails to provide specific citations to admissible evidence to support many of her objections.  Because she is a *pro se* litigant, however, I have considered her submissions in my review of the record despite her failure to comply with the Local Rules, to the extent they are supported by admissible evidence.  More specifically, I treat as admitted the properly supported factual statements in Defendant's Local Rule 56(a)(1) Statement that are met with denials that Shaham has not properly supported with evidence in the record.  *See* Fed. R. Civ. P. 56(e)(2); D. Conn. L. R. 56(a).  I also consider the properly supported facts gleaned from her submissions. Having done so, I treat the following facts as undisputed unless otherwise indicated.

1.    **Shaham's Employment with Vertrax**

Shaham, a woman of "mixed national origin, with a primarily Arabic ethnicity and maternal European ancestry" who "actively identifies as Muslim," ECF No. 16 at ¶ 18,[2] "was hired by Vertrax as a Logistics SAAS Consultant in February 2019."  Defendant's Local Rule 56(a)(1) Statement ("Def. L.R. 56(a)(1) Stmt."), ECF No. 43, ¶ 1; Plaintiff's Local Rule 56(a)(2) Statement ("Pl. L.R. 56(a)(2) Stmt."), ECF No. 46-2, ¶ 1.[3]

---

[1] Plaintiff also filed a document titled "Response to Defendant[']s Summary Judgement Opposition and response to Defendant Beth Lampel Declaration" that appears to be a restatement of ECF No. 46-2, but with fewer pages.
[2] The Defendant does not appear to dispute these allegations from Plaintiff's complaint.
[3]  The page numbers in record citations refer to ECF page numbers.

"On or about November 13, 2019, Vertrax held a meeting with the sales team in the

company's New Haven, Connecticut office." Def. L.R. 56(a)(1) Stmt. ¶ 2; Pl. L.R. 56(a)(2)

Stmt. ¶ 2. Shaham attended this meeting. *Id.* At the meeting, the sales team discussed "training

new clients and determine[d] which trade shows each employee would attend." Def. L.R.

56(a)(1) Stmt. ¶ 3.[4] According to Vertrax, two of Shaham's clients "had opted to complete a

self-install, so Vertrax did not need [Shaham] to deploy trial monitors." Def. L.R. 56(a)(1) Stmt.

¶ 4.[5] And "[i]t was decided during the meeting that Kevin Jaffee," a Vertrax employee, "would

assist with the training on three of Plaintiff's accounts because he was in the vicinity of those

clients while working on another project." Def. L.R. 56(a)(1) Stmt. ¶ 5. "The remainder of

Plaintiff's clients did not proceed with a full installation." Def. L.R. 56(a)(1) Stmt. ¶ 6. "As a

result, Plaintiff would not need to travel to her clients for training or to set up their monitors.

These reasons were communicated to Plaintiff." Def. L.R. 56(a)(1) Stmt. ¶ 7.[6]

### 2.      Shaham's Disability Leave and Termination

"In early January of 2020, Plaintiff reported that she was experiencing certain health

conditions which prevented her from working." Def. L.R. 56(a)(1) Stmt. ¶ 10. "At the time,

Vertrax had approximately 36 employees. Beth Lampel, Vertrax's Operations Manager,

therefore informed Plaintiff that she was not entitled to coverage under the state or federal

---

[4] Shaham objects to this assertion on the basis that this was one of many topics on the agenda for that day. Pl. L.R.
56(a)(2) Stmt. ¶ 3. This objection is immaterial.
[5] Shaham contends in opposition to Defendant's representation that "most of [her] clients were given off to the other
men on [the] team to tra[i]n & deploy," Pl. L.R. 56(a)(2) Stmt. ¶ 4, but the email chain cited as support for her
argument, *see* ECF No. 46-10 (Pl. Ex. M) at 27, does not support this. She proffers no other evidence for this
assertion.
[6] Shaham claims that she was told by Vinny Mullineaux, the CEO of Vertrax, ECF No. 43-2 (Mullineaux Decl. at ¶
1), that the reason she would not be traveling to train her clients was because she was a "girl." *See* Pl. L.R. 56(a)(2)
Stmt. ¶¶ 5-7. But Shaham points to no admissible evidence in the record to support this claim (her own emails
making the same accusation, *see* ECF No. 46-8 at 4, are hearsay), and Mullineaux represents in his affidavit that he
"never said that Plaintiff would not be allowed to go to her clients because she was 'a girl.'" Def. L.R. 56(a)(1)
Stmt. ¶ 8. "A party opposing summary judgment normally does not show the existence of a genuine issue of fact to
be tried merely by making assertions that are based on speculation or are conclusory." *S. Katzman Produce Inc. v.
Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).

Family and Medical Leave Acts."[7]  Vertrax also did not have its own family leave policy.

"M[s]. Lampel informed Plaintiff that she had 15 accrued vacation days that she could use for

paid leave."  Def. L.R. 56(a)(1) Stmt. ¶ 10.[8]  According to her offer letter from the company, as a

full-time Vertrax employee, Shaham was entitled to 15 vacation days per year, to be "accrued

proportionately during [her] first year of employment," and 5 sick days, all of which accrued "on

a monthly basis" in the first year of employment.  ECF No. 46-6 (Pl. Ex. A) at 2; 4.  Other

benefits outlined in Shaham's offer letter included health insurance, for which Vertrax would pay

an unspecified portion, and long-term disability, at a rate of "50% of earnings to a max of $5000

per month/180 days elimination period."  ECF No. 46-6 (Pl. Ex. A) at 4; *see also* Pl. L.R.

56(a)(2) Stmt. ¶ 11.

---

[7] Plaintiff argues that Defendant's PPP loan application filed in April 2020 indicated an employee count of 77 rather than 36.  Pl. L.R. 56(a)(2) Stmt. ¶ 10.  No such information appears in Pl. Ex. C, the evidence Shaham points to.  *See* ECF No. 46-6 (Pl. Ex. C) at 9-30.  ECF No. 46-6 (Pl. Ex. B) at 7, a screenshot of a website called "PPP Detective," does indicate that Vertrax has 77 employees.  But apart from the fact that the information from the "PPP Detective" website is unauthenticated hearsay, there is no evidence in the record suggesting that the author of the information has any personal knowledge of Vertrax's employee count.  *See* Fed. R. Civ. P. 56(c)(4).  Further, in another document supplied by Plaintiff—a May 29, 2020 email from Ms. Lampel to Plaintiff enclosing a report estimating the number of an employer's full-time employees—the number of full-time and full-time-equivalent employees is listed as 35.  ECF No. 37-1 at 12.

[8] Plaintiff asserts that the Defendant was "aware of the Plaintiff[']s physical ongoing disability and limited use of her right body following her cervical spinal neck surgery [in] February 2015," and that her "pre-existing, permanent disability was conveyed to Beth Lampel in writing at start of employment…[along with] Plaintiff[']s concern with having a Short Term/ Long Term Disability plan in place should she experience any further concerns with her active, ongoing, authentically documented cervical spinal implant surgery…."  Pl. L.R. 56(a)(2) Stmt. ¶ 10.  But the cited evidence, ECF No. 46-6 (Pl. Ex. C) at 9-30, which consists of medical records and insurance-related correspondence from 2015, does not support these assertions.  Plaintiff also refers to a six-page "confidential agreement" allegedly indicating Defendant's awareness of her medical disabilities that "can be [made] available on request if the Court so orders," Pl. L.R. 56(a)(2) Stmt. ¶ 10, but does not include this agreement in the record.  Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).  Any such affidavit or declaration "must describe: (1) what facts are sought and how they are to be obtained, (2) how such facts are reasonably expected to raise a genuine issue of material fact, (3) what efforts the affiant has made to obtain them, and (4) why the affiant's efforts were unsuccessful."  *Walden v. Sanitation Salvage Corp.*, 2015 WL 1433353, at *2 (S.D.N.Y. Mar. 30, 2015); *see also Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.1994) (same).  "Here, Plaintiff did not submit an affidavit or declaration, despite having been served with [Notice to Self-Represented Litigant Concerning Motion for Summary Judgment], which attached Rule 56(d) and set forth the requirement for an affidavit supporting a Rule 56(d) discovery request. (*See* [ECF No. 44].)  Nor did Plaintiff provide the information necessary under Rule 56(d), even in a conclusory fashion.  Thus, to the extent Plaintiff seeks relief under Rule 56(d), it is denied.  *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 522 (S.D.N.Y. 2015).

"[Shaham] went out on leave beginning January 24, 2020 and exhausted her 15 accrued vacation days during the first three weeks of her leave." Def. L.R. 56(a)(1) Stmt. ¶ 11. "Vertrax decided that even though it had no policy or legal obligation to do so, the company would allow Plaintiff to take a leave of absence and Vertrax would continue to pay Plaintiff her full salary while assisting her in applying for short-term disability benefits. Vertrax did this so that Plaintiff would not be impacted financially during her leave." Def. L.R. 56(a)(1) Stmt. ¶ 11. [9]

After Shaham went on leave from her employment, she began the process of applying for short-term disability benefits through her employer-provided health insurance with United Healthcare ("UHC"). *See, e.g.*, ECF No. 43-1 (Def. Ex. D) at 19-22. Although neither party specifies when, exactly, this process began for Shaham—for instance, neither party indicates when or how Shaham notified Vertrax she would be seeking disability benefits through her Vertrax UHC policy—the timeline of the completion of Shaham's short-term disability application, as well as the reasons for its purported delay, are hotly disputed by the parties. The relevant facts in dispute are outlined below.

Vertrax first asserts that "[o]n March 2, 2020, Ms. Lampel texted Plaintiff to check in on her short-term disability forms," Def. L.R. 56(a)(1) Stmt. ¶ 13 and that "Ms. Lampel assisted Plaintiff with sending in the required paperwork for her short-term disability claim," *id.* at ¶ 14. Shaham, on the other hand, argues that Vertrax held up her disability claim application, pointing to a series of texts and emails between herself and Lampel. *See* Pl. L.R. 56(a)(2) (ECF No. 46-2) at ¶¶ 13-16. [10] But the communications cited by Shaham indicate only that Lampel checked in

---

[9] Plaintiff contends that during her absence, Vertrax hired Sam Pegram, a man, to replace her, *see* Pl. L.R. 56(a)(2) Stmt. ¶ 12, but the cited evidence—undated screenshots of a social media post and text messages, *see* Pl. L.R. 56(a)(2) Stmt. Ex. E, ECF No. 46-7 at 6—does not support this. Although a text message refers to the hiring of Sam Pegram, *id.*, nothing in the message suggests he was hired to replace her.

[10] Shaham's response to paragraph 15 of Defendant's Local Rule Statement is at paragraph 16 of her response. *See* ECF No. 46-2 at 13.

with Shaham about Shaham's progress in completing her application at various points throughout February and March, ECF No. 46-7 at 15-17, 21-23, and that on March 2, Shaham indicated that she had emailed a form to her doctor and would "send it over to [Lampel] as soon as [she got] it completed," ECF No. 46-7 at 18.

Vertrax further contends that "[o]n March 24, 2020, Ms. Lampel emailed Plaintiff letting her know that everything had been submitted," Def. L.R. 56(a)(1) Stmt. ¶ 14, and "[o]n March 25, 2020, Ms. Lampel resubmitted the employer portion of the short-term disability claim application," *id.* at ¶ 15.  In response, Shaham takes issue with the "resubmitted" language, pointing to a letter from UHC dated March 19, 2020, which notes the status of her short-term disability claim to be "incomplete" and alerts Shaham that as of March 19, UHC had not received the "employer statement" necessary to begin reviewing Shaham's claim.  ECF No. 46-8 (Pl. Ex. F) at 8.

The parties agree that Shaham's short-term disability claim was approved by UHC on April 3, 2020.  *See* Def. L.R. 56(a)(1) Stmt. ¶ 18; Pl. L.R. 56(a)(2) (ECF No. 46-2) at ¶ 17.  "On April 3, 2020, Ms. Lampel emailed Plaintiff to let her know that United Healthcare had approved her claim retroactively through and including March 21, 2020…. Ms. Lampel also indicated in this email that effective March 20, Vertrax would stop paying her salary, which Vertrax had been paying as a courtesy…because her short-term disability claim had been approved."  Def. L.R. 56(a)(1) Stmt. ¶ 18.  An April 20, 2020 letter from UHC to Plaintiff indicated that the disability benefits "would be provided retroactively for the period of February 1, 2020 through March 21, 2020."  Def. L.R. 56(a)(1) Stmt. ¶ 23.[11]  In that same letter, UHC also requested additional

---

[11] Plaintiff disputes this as follows: "[t]he claim was only approved to reimburse Vertrax for what they had paid the employee from 2/1/2020 – 3/21/2020. The plaintiff received NO income from the [UHC] STD or LTD assistance plan during her request for medical leave."  Pl. L.R. 56(a)(2) Stmt. ¶ 23.  This contention is immaterial considering Shaham does not dispute she was paid by Vertrax during this period.

information from Shaham, including a "mental status form" and medical records from two healthcare providers.  ECF No. 46-8 (Pl. Ex. G) at 11.

"By the time Plaintiff's claim for short-term disability benefits was approved, Vertrax had paid Plaintiff's full salary including commissions from January 25 through March 20, 2020, despite having no policy or legal obligation to do so. This was done as a matter of professional courtesy so that Plaintiff would not be impacted financially."  Def. L.R. 56(a)(1) Stmt. ¶ 19.[12] Shaham was also included in Vertrax's April 17 gift of "$50 Amazon gift cards [to] all employees" to "thank[] them for their loyalty during COVID-19." Def. L.R. 56(a)(1) Stmt. ¶ 22; Pl. L.R. 56(a)(2) Stmt. ¶ 22.  And "[t]hroughout Plaintiff's absence, Vertrax either paid for or continued to make a contribution to Plaintiff's health insurance despite the fact that she had not been working."  Def. L.R. 56(a)(1) Stmt. ¶ 29.[13]

"On April 24, 2020, Ms. Lampel sent Plaintiff an email attaching the United Healthcare letter and clarified that since United Healthcare had approved her claim through March 21, 2020, her paycheck from Vertrax dated March 27, 2020 (covering the time period from March 6 through March 20) would be her final payment from Vertrax.  In addition, Ms. Lampel explained that Vertrax had no control over what benefits United Healthcare approved going forward or what it was paying Plaintiff.  Ms. Lampel further explained that if Plaintiff wanted to extend her

---

[12] Plaintiff objects to this representation, arguing that "the reason [Vertrax] kept the [Plaintiff] on payroll" was that they "failed to send the Employer portion of the [short-term disability] application to [United Healthcare] until 3/24/20," Pl. L.R. 56(a)(2) Stmt. ¶ 19, but the cited evidence, ECF No. 46-7 (Pl. Ex. F) at 15-24; ECF No. 46-8 (Pl. Ex. F) at 1-10, does not support this proposition.  Plaintiff's own emails making the same claim, ECF No. 46-8 at 6, are hearsay and may not be considered on summary judgment.  Fed. R. Evid. 56(c)(2), (4).
[13] Plaintiff argues that "Vertrax never paid for [her] health insurance," instead "demand[ing] [that she] pay over $850 per month for health coverage while having NO income or assistance from the STD or LTD [UHC] plan she was fully entitled to…" but does not provide any support for this contention.  Pl. L.R. 56(a)(2) Stmt. ¶ 29.

benefits beyond March 21 and continue to get paid through United Healthcare, she would need to continue to deal directly with United Healthcare." Def. L.R. 56(a)(1) Stmt. ¶ 24.[14]

"On May 20, 2020, Ms. Lampel sent Plaintiff a spreadsheet showing her April BD Incentive Compensation.[15] It was run through payroll and deposited into her bank account that week." Def. L.R. 56(a)(1) Stmt. ¶ 25.[16] "On May 29, 2020, Plaintiff requested 'appropriate paperwork or forms to me regarding my eligibility for Federal FMLA leave.' Ms. Lampel responded that day explaining that FMLA only applies to companies with more than 50 full time employees and Vertrax only had 36 employees." Def. L.R. 56(a)(1) Stmt. ¶ 26.[17] "On May 29, Ms. Lampel also sent Plaintiff the policies and welcome brochure for short-term disability, long-term disability and life insurance offered by Vertrax. Ms. Lampel indicated that the process for applying for long-term disability is explained in the brochure and that Plaintiff would have to log on to a website and submit her claim." Def. L.R. 56(a)(1) Stmt. ¶ 27; Pl. L.R. 56(a)(2) Stmt. ¶ 26.[18] Defendant claims that "[t]o Ms. Lampel's knowledge, no additional information was ever provided by Plaintiff to United Healthcare for purposes of long-term disability." Def. L.R. 56(a)(1) Stmt. ¶ 28. Shaham disagrees, pointing to a letter dated July 23, 2020 and addressed to "Andrea Dougnhty [*sic*], Claims Clerk UNH" in which the Plaintiff details her medical history

---

[14] Plaintiff refers to "phone records conversations" to dispute this fact, Pl. L.R. 56(a)(2) Stmt. ¶ 24, but does not point the Court to where in the record those phone records are. A review of the record indicates that the referenced phone records are located at ECF No. 46-7 (Pl. Ex. E) at 4 and ECF No. 37-1 at 15-19. Defendant objects to the phone records submitted by Shaham on the ground that they are inadmissible hearsay. ECF No. 45 at 6-7.

[15] Defendant does not define the term "BD Incentive Compensation" in its statement of facts.

[16] The evidence Shaham points to in opposition to this statement by Plaintiff does not support the contention that commissions were missing from this payment. *See* Pl. L.R. 56(a)(2) Stmt. ¶ 25 (citing Pl. L.R. 56(a)(2) Stmt. Ex. F). Again, while they include emails by Plaintiff asserting that commissions were missing, *see* ECF No. 46-8 at 4, this is not admissible evidence.

[17] Plaintiff claims that Vertrax was covered by the FMLA because its PPP Loan application reported 77 employees, Pl. L.R. 56(a)(2) Stmt. ¶ 26, but, as previously noted, the screenshot from the "PPP Detective" website provided by Plaintiff, ECF No. 46-6 at 7, is not admissible evidence the Court may consider on this motion. *See supra*, note 7.

[18] Paragraph 26 in Shaham's Local Rule 56(a) Statement in Response corresponds to paragraph 27 in Defendant's Local Rule 56(a) Statement.

over the spring and summer of 2020.  Pl. L.R. 56(a)(2) Stmt. ¶ 28; ECF No. 46-8 at 15-24 and

ECF No. 46-9 at 1-3.  There is no indication that this letter was provided to Defendant.

"On June 1, 2020, Vertrax requested that Plaintiff advise it by the end of the week if and

when she intended to return to work.  Plaintiff responded that she planned on returning to work

when she 'healed from cancer.'"  Def. L.R. 56(a)(1) Stmt. ¶ 30; Pl. L.R. 56(a)(2) Stmt. ¶ 30.

"Later in the day on June 1, Plaintiff again stated that she planned to return to work and that she

would have an update on the time frame 'required to treat [her] disability' as soon as her

physician could provide it."  Def. L.R. 56(a)(1) Stmt. ¶ 31.[19]

"On or about June 9, 2020, Vertrax received a letter from United Healthcare explaining

that they had suspended their review of Plaintiff's short-term disability claim until they "received

and reviewed additional medical data[] we have requested on her behalf from her provide[r]s."

Def. L.R. 56(a)(1) Stmt. ¶ 32; Pl. L.R. 56(a)(2) Stmt. ¶ 32.  Shaham also received a letter from

UHC around this date notifying her that it had not received any of the medical information from

her that it needed to complete its "medical review."  ECF No. 46-8 (Pl. Ex. G) at 14.  In its letter

to Shaham, UHC followed up on its "request for information from May 12, 2020," which

included a request for copies of her medical records "from all providers for the period of April

01, 2020 through the present (May 12, 2020) for our continued review, **no later than May 28,**

**2020**."  ECF No. 46-8 (Pl. Ex. G) at 14 (emphasis in original).

In addition to the letter from UHC, Shaham also received notice of the suspension of her

disability benefits from Defendant.  On June 10, Lampel sent Shaham the following email:

> We received [] correspondence from United Healthcare advising us that their review of
> your [short-term disability] application has been suspended pending further

---

[19] Plaintiff denies this statement, Pl. L.R. 56(a)(2) Stmt. ¶ 31, but points to no evidence supporting this denial, and
the evidence cited by Defendant—an email from Shaham informing Lampel that she did plan on returning to work
and that she would have an update on the "time frame" for her return to work "as soon as [her] physicians [could]
provide [it]," ECF No. 43-1 (Lampel Decl. Ex. P) at 50—supports this proposition.

documentation from you.  We are also in receipt of your email indicating that you will provide us with additional information concerning your ability to return to work once you have an update from your physician.  Since you have indicated it is your intent to return to work, we will continue to treat your absence as an unpaid leave of absence for the time being assuming that this information is forthcoming in the near future.  We ask that this information be provided by July 1, 2020.

ECF No. 46-10 (Pl. Ex. K) at 6; *see also* Def. L.R. 56(a)(1) Stmt. ¶ 33.[20]  Lampel's email further

advised Shaham of the following changes to her health insurance coverage:

Also, we have been paying your contribution to all health insurance premiums (health, dental and vision) since April.  We are not asking that this be repaid.  However, in order to continue this coverage going forward, we will need you to provide us with a check for your contributions in the amount of $499.62 on or before July 1, 2020 to cover your portion of the July premiums. This is the monthly amount that would have been deducted from your paycheck if we were paying you.  This amount will be due by the 1st of each month that you are out on leave.

ECF No. 46-10 at 6.

"In response, Plaintiff advised Vertrax that she was being admitted to MD Anderson

Cancer Hospital in Houston Texas and that she would provide the doctors' confirmation and

status when they are able to provide it.  She never provided this information nor did she

communicate with Vertrax whatsoever."  Def. L.R. 56(a)(1) Stmt. ¶ 34.[21]  "In fact, Plaintiff

failed to communicate with Vertrax for nearly six months, from June 10 to December 2, 2020.

During this time, Vertrax continued to contribute its share of Plaintiff's health insurance

premiums (health, dental and vision)."  Def. L.R. 56(a)(1) Stmt. ¶ 35.[22]

---

[20] Plaintiff objects to this statement on the basis that she provided UHC and Defendant with information regarding her health, including a "tumor removal [and] reproductive organ surgery" she needed "in early June 2020."  Pl. L.R. 56(a)(2) Stmt. ¶ 33.  But the evidence Plaintiff points to does not indicate that this information was provided to either Defendant or UHC.

[21] Plaintiff argues that she was unable to provide this information to Defendant because she received an email from defense counsel instructing her to "cease any further communications with anyone at Vertrax."  Pl. L.R. 56(a)(2) Stmt. ¶ 34; ECF No. 46-9 (Pl. Ex. J) at 13.  Shaham's own evidence indicates that this email was sent after she informed five Vertrax employees that she had "filed a notarized complaint to the CT Human Rights Commission as well as the EEOC."  ECF No. 46-9 (Pl. Ex. J) at 15.  And while the letter did instruct Shaham to cease communication with Vertrax employees, it also stated that "[a]ny further communication concerning [her] claims must be directed to [defense counsel's] attention." ECF No. 46-9 (Pl. Ex. J) at 13.

[22] Plaintiff objects to this assertion on the same basis as discussed in footnote 1.  Pl. L.R. 56(a)(2) Stmt. ¶ 35.

"On December 2, 2020, Plaintiff emailed Vertrax inquiring about commission payments and health insurance invoices, with no mention of when she would be returning to work." Def. L.R. 56(a)(1) Stmt. ¶ 36; ECF No. 46-10 at 4 (Pl. Ex. J). Vertrax, citing Ms. Lampel's declaration, maintains that it "responded to those inquiries." Def. L.R. 56(a)(1) Stmt. ¶ 36. Shaham disagrees, Pl. L.R. 56(a)(2) Stmt. ¶ 36, but the exhibit she cites, ECF No. 46-10 (Pl. Ex. J) at 4, does not support her denial.

"On December 4, 2020, Vertrax terminated Plaintiff's employment by emailing her a letter. As laid out in the letter, the decision to terminate Plaintiff's employment was due to her failure to communicate with Vertrax for nearly six months and failure to provide documentation from her physician regarding her claimed entitlement to leave and her ability to return to work. Vertrax confirmed that her termination would not impact any rights the Plaintiff had to pursue short term and long-term disability benefits. Vertrax paid Plaintiff's December health insurance premium subject to Plaintiff's monthly contribution." Def. L.R. 56(a)(1) Stmt. ¶ 37.[23] "Plaintiff was eligible for continuation of her Vertrax insurance coverage under COBRA and continued COBRA coverage from the date of her termination through January 2022." Def. L.R. 56(a)(1) Stmt. ¶ 38; Pl. L.R. 56(a)(2) Stmt. ¶ 38. "On January 5, 2022, Ms. Lampel reminded Plaintiff that her COBRA payment for the month of January was due January 15, 2022. Plaintiff failed to make the payment despite multiple reminders and as a result, her COBRA coverage was terminated effective January 1, 2022." Def. L.R. 56(a)(1) Stmt. ¶ 39.[24]

---

[23] Plaintiff objects to this assertion on the same basis as discussed in footnote 21. Pl. L.R. 56(a)(2) Stmt. ¶ 37.
[24] The exhibit cited by Shaham (ECF No. 46-10 at 5-13, Pl. Ex. K) does not appear to include the statement from Plaintiff to Beth Lampel referenced in her objection. *See* Pl. L.R. 56(a)(2) Stmt. ¶ 39 (citing Ex. K).

3.      **Shaham's Medical Conditions**

While Shaham was on leave, she disclosed the following additional information

regarding her health conditions to Defendant:

- "On February 26, 2020, Plaintiff voluntarily disclosed information about her []
  'neurological condition' and 'new autoimmune condition' [via email] to various
  individuals at Vertrax including Ms. Lampel, Craig Balzer, Patrick Halpin, Vinny
  Mullineaux, and Kevin Jaffe.  Among other details, Plaintiff described her
  'medical nightmare' of what felt like 'irregular 'biological brain activity' for sure
  during the seizure type episodes which have been getting more frequent and
  different feeling each time.' The email thread also included a screen shot of a
  message from her medical provider." Def. L.R. 56(a)(1) Stmt. ¶ 12.
- "On March 27, 2020, Plaintiff voluntarily sent an email to Ms. Lampel, Mr.
  Balzer, Mr. Halpin, Mr. Mullineaux, Mr. Turcotte and Kevin Jaffe disclosing
  information about her alleged health conditions, specifically her
  'encephalopathy.'" Def. L.R. 56(a)(1) Stmt. ¶ 16.[25]
- "On April 3, 2020, Plaintiff sent another email to Ms. Lampel, Mr. Balzer,
  Richard Jaffe and Kevin Jaffe referencing the 'encephalopathy of [her] brain.'"
  Def. L.R. 56(a)(1) Stmt. ¶ 20; Pl. L.R. 56(a)(2) Stmt. ¶ 20.
- "On April 7, 2020, Plaintiff sent a mass email ["replying all" to an email inviting
  employees to a virtual "happy hour"] to her colleagues at Vertrax disclosing that
  she was 'experiencing symptoms of the COVID-19 virus along with having
  cancer' and that she was 'being tested for the virus via our drive-up testing
  provided here by the County and CDC.'" Def. L.R. 56(a)(1) Stmt. ¶ 21; Pl. L.R.
  56(a)(2) Stmt. ¶ 21

And in a sworn declaration from Stanley Snow, Shaham's former partner, submitted in

response to Defendant's Local Rule 56(a) Statement, Shaham points to evidence suggesting that

with Snow's help, she traveled from Florida to Texas in 2020 to receive medical care.  Snow

Decl., ECF No. 46-5, at ¶ 3.[26]  Once Shaham arrived in Texas, the two "began looking for

doctors and surgeons to help" her.  ECF No. 46-5 at ¶ 5.  While there, Snow "could see how

---

[25] Plaintiff's objection that she provided updates to certain Vertrax employees prior to March 27, Pl. L.R. 56(a)(2)
Stmt. ¶ 17 (numbered as ¶ 17 but responding to Def. L.R. 56(a)(1) Stmt. ¶ 16), is inapposite.

[26] I do not consider the allegations in the Snow Declaration that are hearsay.  *See DiStiso v. Cook*, 691 F.3d 226, 230
(2d Cir. 2012) ("[W]here a party relies on affidavits…to establish facts, the statements 'must be made on personal
knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to
testify on the matters stated.'") (quoting Fed. R. Civ. P. 56(c)(4)).

much pain she was in even when walking." ECF No. 46-5 at ¶ 5. "The Plaintiff had another aggressive seizure[-]type episode that caused her to be taken by ambulance at 10 PM on 5/6 to a near[]by F[or]t Worth[,] T[exas] hospital ER," ECF No. 46-5 at ¶ 5. Snow "drove [and] travelled by bus with [Shaham] to the Burzynski Cancer Clinic in early June 2020 in Houston[,] Texas," to "multiple doctors in May for [a] surgery consult[,] as well as the MD Anderson Cancer Center hospital [in] mid[-]June 2020…." ECF No. 46-5 at ¶ 6.

Shaham also submitted in support of her Local Rule 56(a)(2) Statement and her motion for summary judgment "excerpts from medical records and health summaries," which Defendant objects to as inadmissible hearsay. ECF No. 45 at 5-6. I summarize the content of those records below:

- Shaham underwent a 72-hour "continuous ambulatory EEG" from February 25 to February 27, 2020, ECF No. 46-7 (Pl. Ex. E) at 1-2, after being referred by a medical provider on February 24, *id.* at 5.
- During a March 5, 2020 appointment with Ronald Aung-Din, M.D., Dr. Aung-Din reviewed the Plaintiff's EEG and determined that it was "not normal" and that it "is revealing of encephalopathy." *Id.* at 3. The report from that visit further stated that "During the [EEG] recording, [Shaham] had symptoms of buzzing sensations in her head and body and cognitive dysfunction. She is unable to work as a result. She works with high-level CEOs and cognitive ability is a key. Accordingly, she is requesting leave of absence and short-term disability. I would be in agreement with that pending further workup." *Id.*
- Records from a March 16, 2020 OB/GYN appointment documented Plaintiff's "past medical history" as including "[e]ncephalopathy [diagnosed] 2/28/20," "[t]hyroid disorder," and "[e]pilepsy and recurrent seizures [that] started end of January 2020 [with the] last one [occurring] 2/21/20," and a "past surgical history" of a February 2015 "cervical neck surgery" replacing "disc C5-7" with a "cadaver bone" and a "titanium plate." *Id.* at 10. Those records also report that a "[r]ecent CT scan in Sarasota Memorial ER revealed fibroid uterus with simple cysts on left ovary," that "[c]hronic incapacitating left-sided pain [was] restricting mobility and [causing an] inability to perform to her normal level including jogging which is too painful on the left side," and that "[a]utoimmune encephalitis…[was] inflaming the left side of her brain causing right sided symptoms and possible mini seizures." *Id.* at 12.
- Medical records from an OB/GYN appointment on March 18, 2020 where a "[v]aginal ultrasound" revealed a "fibroid uterus" state that "[b]ased on severity of pain with

14

significant growing fibroid especially when compared to previous ultrasound performed June 11, 2009…surgical options were discussed in moderate detail" and that Plaintiff had "contemplated these options and agrees." *Id.* at 8.

There is no indication that these records were provided to either UHC or Defendant.

The documents submitted in support of her own motion under the heading "Plaintiff's Statement of Material Facts," ECF No. 37-1, include the following:

- Dated and undated excerpts of medical records and email correspondence noting conditions such as "[c]hronic kidney disease," "[n]ephrolithiasis," "neurofibromatosis," "[s]eizures," a "[c]arcoma tumor," a "schwannoma," "[s]pina bifida," "[m]uscle weakness," and procedures such as a "[l]aproscopic [h]ysterectomy." ECF No. 37-1 at 5-10.
- A letter dated March 11, 2022 from Shaham to an unnamed recipient seeking "FMLA Covid Emergency [A]ct…recovery," outlining her health history, and stating that she had "supplied [to her] employer a [n]eurologist[-]completed Physician Disability Statement in February 2020" and had been denied FMLA assistance by Vertrax. *Id.* at 11;

Again, there is no indication that these records were provided to either UHC or Defendant.

## B.   Procedural History

Through counsel, Shaham commenced this action against Vertrax on February 10, 2021. ECF No. 1.  After Vertrax moved to dismiss the complaint, I gave Shaham an opportunity to amend her complaint, "plead[ing] as many facts as possible, consistent with Rule 11, to address the alleged defects discussed in Defendant's memorandum of law," and indicated that I would not allow further amendments after this opportunity.  ECF No. 12.  Shaham's counsel filed an amended complaint (ECF No. 16), the operative complaint in this case, asserting six counts: (1) discrimination in violation of the ADA, (2) retaliation in violation of the ADA, (3) negligent infliction of emotional distress, (4) negligent misrepresentation, (5) discrimination in violation of Title VII, and (6) retaliation in violation of Title VII.  Vertrax filed an answer.  ECF No. 20.

During discovery, Shaham's counsel withdrew.  *See* ECF No. 35.  Proceeding *pro se*,

Shaham filed a motion for summary judgment.  *See* ECF Nos. 37, 38, 39.[27]  She did not file a

memorandum of law in support of her motion; instead, she filed an unsworn statement setting

forth her version of events but presented without specific citations to the record.  ECF No. 38.

Vertrax filed a memorandum in opposition to Shaham's summary judgment motion.  ECF No.

45.  Shaham did not file a reply.

After Shaham filed her motion, Vertrax filed a cross-motion for summary judgment, ECF

No. 42.  Shaham filed a response to Vertrax's motion consisting of a line-by-line response to Ms.

Lampel's declaration, ECF No. 46, a copy of her complaint, ECF No. 46-1, a document I

construe as a Local Rule 56(a)(2) statement, ECF No. 46-2, and a series of exhibits, ECF Nos.

46-3-10.  Vertrax filed a reply brief.  ECF No. 47.[28]

## III.    LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  "A genuine dispute of material fact exists for summary judgment

purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such

that a reasonable jury could decide in that party's favor."  *Zann Kwan v. Andalex Grp. LLC*, 737

---

[27] Shaham filed three documents labeled "Motion for Summary Judgment" on the docket, but only one of those
documents, ECF No. 38, appears to be her intended summary judgment motion.  The other documents—ECF Nos.
37 and 39—appear to be a duplicate of her motion (ECF No. 39) and the supporting exhibits to her motion (ECF No.
39).  Also, as Vertrax notes in its response to plaintiff's motion, Shaham "did not submit a Local Rule 56(a)(1)
Statement of Undisputed Material Facts with her Motion for Summary Judgment."  ECF No. 45 at 2.  Accordingly,
Vertrax did not file a "corresponding Local Rule 56(a)2 Statement" and instead "incorporate[d] by reference its
Local Rule 56(a)1 Statement of Undisputed Material Facts dated April 28, 2022 (Doc. 43) which was submitted in
support of [its] Motion for Summary Judgment."  *Id.*
[28] Plaintiff has made several filings making largely irrelevant and unsupported accusations, including a statement
that she believes I had an ex parte communication with "Mr[.] Ted Heiser, Mr[.] Kamal Shaham and MANY
others…."  ECF No. 51 at 1.  This is not correct, and I will not address it further.

F.3d 834, 843 (2d Cir. 2013).  "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. Rule Civ. Proc. 56(c)).  "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id.* (internal quotation marks omitted).

"When both parties have moved for summary judgment, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Dish Network Corp. v. Ace Am. Ins. Co.*, 21 F.4th 207, 212 (2d Cir. 2021) (internal quotation marks omitted).  "Although a court is required to read a self-represented party's papers liberally and interpret them to raise the strongest arguments that they suggest, unsupported allegations do not create a material issue of fact and do not overcome a properly supported motion for summary judgment."  *Lindsay v. Cook*, 2021 WL 5827080, at *2 (D. Conn. Dec. 7, 2021) (internal citations, alteration, and quotation marks omitted).

## IV.   DISCUSSION

### A.   Defendant's Motion

I first consider Vertrax's motion for summary judgment and will therefore view the record in the light most favorable to Shaham and draw all reasonable inferences in her favor. *See, e.g.*, *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011).  I consider Shaham's Title VII claims (Counts Five and Six) first, followed by her ADA claims (Counts One and Two) and her state law claims (Counts Three and Four).

1.      **Title VII Discrimination (Count Five)**

In her complaint, which was drafted by counsel, Shaham alleges gender discrimination in

violation of Title VII.  Specifically, she alleges that Vertrax discriminated against her based on

her gender "by restricting her from visiting customers[29] and terminating her."  ECF No. 16 at ¶

59.[30]

Title VII prohibits an employer from "discharg[ing] any individual, or

otherwise…discriminat[ing] against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex,

or national origin."  42 U.S.C. § 2000e-2(a)(1).  On summary judgment, Title VII claims are

analyzed using the three-stage framework from *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973).

> At the first stage, the plaintiff bears the burden of establishing a "prima facie" case.  The
> requirements to establish a prima facie case are minimal, and a plaintiff's burden is
> therefore not onerous.  Establishment of the prima facie case in effect creates a
> presumption that the employer unlawfully discriminated against the employee.  At the
> second *McDonnell Douglas* stage, the presumption created by the prima facie case places
> upon the defendant the burden of producing an explanation to rebut the prima facie
> case—i.e., the burden of 'producing evidence' that the adverse employment actions were
> taken for a legitimate, nondiscriminatory reason.  However, while the presumption shifts
> the burden of production to the defendant, the ultimate burden of persuading the trier of
> fact that the defendant intentionally discriminated against the plaintiff remains at all times
> with the plaintiff.  If the defendant satisfies its burden of production, then the
> presumption raised by the prima facie case is rebutted and drops from the case.  At the
> final stage, the plaintiff then has the opportunity to demonstrate that the proffered reason
> was not the true reason for the employment decision—a burden that merges with the

---

[29] Vertrax does not contend that "restricting [an employee] from visiting [her] customers" is not a materially adverse
employment action under Title VII.  *See, e.g.*, *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) ("An
adverse employment action is a materially adverse *change* in the terms and conditions of employment.") (internal
quotation marks omitted) (emphasis in original). I therefore assume it is for the purposes of this ruling.
[30] At one point, the complaint alleges that Beth Lampel, Vertrax's human resources director, failed to invite her to
the company's 2019 Christmas party "despite the fact that all other employees, none of whom identify as Muslim
were invited."  ECF No. 16 at ¶ 22.  Even if I assumed this was an attempt to allege a Title VII religious
discrimination claim, such a claim would fail.  There is no allegation or evidence that Vertrax was aware of her
Muslim faith and there is no evidence that the employees actually invited to the party were not also Muslim.  I
therefore consider her Title VII claim as asserting only gender-based discrimination.

ultimate burden of persuading the court that she has been the victim of intentional
discrimination.

*Bucalo v. Shelter Island Union Free School Dist.*, 691 F.3d 119, 128-29 (2d Cir. 2012) (internal

quotation marks, citations, and alterations omitted).

To establish a prima facie case, "the plaintiff must demonstrate that: (1) she fell within a

protected class under Title VII; (2) she was qualified for the position she held; (3) she was

subjected to an adverse employment action; and (4) the adverse action occurred under

circumstances giving rise to an inference of discrimination."  *Robinson v. Concentra Health*

*Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450

U.S. 248, 252–53 (1981)).

Vertrax contends that Shaham's prima facie case fails at the last step of the analysis—that

is, that "there is no evidence giving rise to an inference of discrimination."  ECF No. 42-1 at 23.

But its arguments on this point address the second stage of the burden-shifting framework, i.e.,

its burden to establish a legitimate, nondiscriminatory reason for the adverse actions, instead of a

failure on Shaham's part to adduce evidence of circumstances giving rise to an inference of

discrimination.  *See id.* at 23-24.  Furthermore, "the evidence necessary to satisfy [the plaintiff's]

initial burden [is] 'minimal' and 'de minimis.'"  *Zimmermann v. Assocs. First Cap. Corp.*, 251

F.3d 376, 381 (2d Cir. 2001).  Recognizing that she is a *pro se* litigant as well as the nonmoving

party, meaning that I must construe the record liberally in her favor and view the facts in the

light most favorable to her, I will assume without deciding that Plaintiff has made out a prima

face case and move to the second stage of the analysis.

At the second stage, Vertrax has sustained its burden by submitting evidence of

legitimate, nondiscriminatory reasons for the alleged discriminatory conduct.  First, as to

Shaham's claim that she was restricted from visiting her customers, Vertrax has presented

19

evidence of nondiscriminatory reasons for this action.  Specifically, Vertrax points to evidence

that at the November 2019 sales team meeting, where training new clients was discussed, it was

noted that "[t]wo of Plaintiff's clients had opted to complete a self-install, so Vertrax did not

need [Shaham] to deploy trial monitors."  ECF No. 43 at ¶ 4; ECF No. 43-2 at ¶ 4.  At that same

meeting, it was decided "that Kevin Jaffee would assist with the training on three of Plaintiff's

accounts because he was in the vicinity of those clients while working on another project," and

"[t]he remainder of Plaintiff's clients did not proceed with a full installation."  ECF No. 43-2 at

¶¶ 5-6.  For these reasons, which were communicated to Shaham, she was not needed to train the

clients.  *Id.* at ¶ 7.  Finally, in his sworn statement, Mullineaux avers that he "never said that

Plaintiff would not be allowed to go to her clients because she was 'a girl.'"  *Id.* at ¶ 8. These

explanations are sufficient to discharge Vertrax's burden of articulating a legitimate,

nondiscriminatory reason for why Shaham was not sent to train certain of her clients.  As for

Shaham's termination, Vertrax has sufficiently articulated a legitimate reason for that action as

well.  Vertrax contends, and Shaham does not dispute, that by the time she was terminated "on

December 4, 2020, after a nearly year-long leave of absence," she had failed to provide Vertrax

with any update as to her ability to return to work, or to provide the company with medical

records it had requested for nearly six months.  ECF No. 42-1 at 23-24; *see also* Def. L.R.

56(a)(1) Stmt. ¶ 33-37.

       Where, as here, the employer has carried its burden of articulating a nondiscriminatory

reason for the adverse employment action, the plaintiff must come forward with admissible

evidence "to support a rational finding that the legitimate, non-discriminatory reasons proffered

by the [defendant] were false, and that more likely than not [discrimination] was the real reason

for the [adverse] [employment action]."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.

2000) (internal quotation marks omitted).  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."  *Weinstock*, 224 F.3d at 42; *see also Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010) ("It is sufficient for a plaintiff to prove that discrimination played a role in motivating the adverse action taken against the plaintiff.").  "Conclusory and substantially unsupported assertions of pretext are inadequate…."  *Henderson v. Gen. Elec. Co.*, 469 F. Supp. 2d 2, 13 (D. Conn. 2006).

In support of her claim that she was prevented from providing training for her clients, Shaham offers only the *allegations* that Mullineaux told her at the meeting that others would be going in her place because she was "a girl" and that the employees sent to train her clients in her place were male.  ECF No. 46-2 at ¶ 7.[31]  She offers no admissible evidence to support this allegation, and Vertrax has submitted admissible evidence rebutting the allegation, i.e., Mullineaux's sworn affidavit.  As to her discrimination claim based on her termination, there is no admissible evidence in the record that suggests that discrimination was a motivating factor for her termination.[32]  Shaham contends that she was replaced by Sam Pegram, a male, "weeks after [her] request for temporary medical leave," ECF No. 46-2 at ¶ 4, but the cited evidence does not

---

[31] I do not credit the assertion in the Lampel Declaration submitted by Defendant that Vertrax employee Craig Balzer "merely 'stopped by' [Plaintiff's client's] facility in the fall of 2019 because he was in the area for a presentation for another customer;" that "Mr. Balzer was only on premises with [the client] for an hour;" that "[he] did not do the pilot or training; or that "[the client] intended to do a self-install," ECF No. 47-1 at ¶ 2, because the Declaration does not show that these assertions are based on personal knowledge.

[32] As previously indicated, Shaham has submitted what she says are records of phone conversations between UHC representatives and Shaham or Vertrax.  In one excerpt, a UHC representative notes on April 8, 2020 that Vertrax reported that "they need to replace her, they are a small company and felt bad for her…They feel bad she may not have any mon[ey], but have to possibley [*sic*] terminate her position as she is not able to [return to work]."  ECF No. 46-7 at 4.  These phone records are, as Vertrax notes, inadmissible hearsay: Although they purport to memorialize statements of Vertrax, a party opponent, the memorialization itself is an out-of-court statement offered for its truth, and Shaham has submitted no evidence suggesting it is a business record under Fed. R. Evid. 803(6) or would otherwise fit within an exception to the hearsay rule.  Furthermore, even if the records were offered in an admissible form, they would not, by themselves, establish that the reason Vertrax has given for its decision to terminate Shaham (a failure to communicate) is pretext.  Vertrax did not terminate her in April and there is no other evidence suggesting that its alleged statements in April accurately reflected the reasons for terminating her eight months later. In any event, even these hearsay statements do not suggest that Vertrax was motivated by discriminatory animus in terminating her.  The most these phone records suggest is that Vertrax had a need to fill Shaham's role in her absence.

support this contention.  A thorough review of Plaintiff's submissions reveals no evidence on this point aside from Shaham's conclusory assertion that Pegram was hired to replace her.  And Vertrax's evidentiary submissions plainly contradict Shaham's unsupported narrative.  For instance, Ms. Lampel's declaration and the supporting exhibits indicate that Mr. Pegram applied for a job at Vertrax *before* Shaham went on medical leave.  *See* ECF No. 47-1 at ¶¶ 3-4.  Furthermore, the offer letter provided by Vertrax indicates that Mr. Pegram was hired as a "Business Development Manager," ECF No. 47-1 at 6, which, according to her own complaint, was not Shaham's role at Vertrax, *see* ECF No. 16 at ¶¶ 16, 36 (referring to Shaham's roles at Vertrax as "Logistics SAAS Consultant" and "SAAS Software Consultant"); *see also* ECF No. 47-1 at 5 (Lampel averring that "Mr. Pegram was not hired to replace Plaintiff but rather he was hired as an additional member of the sales team.").  Because Shaham has "failed to produce any evidence, other than conclusory statements unsupported by the record, to rebut the legitimate, nondiscriminatory reasons offered by [Vertrax], let alone evidence that could reasonably support a verdict in [her] favor," *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 99 (2d Cir. 2001), I find that Vertrax is entitled to summary judgment on her discrimination claim.

## 2.    Title VII Retaliation (Count Six)

In her complaint, Shaham alleges that "[b]y terminating [her], Vertrax retaliated against her for requesting reasonable accommodations for the disabilities for which she suffered."  ECF No. 16 at ¶ 62.  Title VII's anti-retaliation provision makes it unlawful "for an employer to discriminate against any of [its] employees…because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a); *see also McMenemy v. City of Rochester*, 241 F.3d 279,

284 (2d Cir. 2001) ("Title VII protects an employee from any employer…who retaliates against h[er] because of h[er] prior or ongoing opposition to an unlawful employment practice or participation in Title VII proceedings.") (emphasis omitted).  As the Second Circuit has explained,

> The [anti-retaliation] provision seeks to further Title VII's goal of a workplace free from discrimination *on the basis of race, ethnicity, religion, or gender* "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII]'s basic guarantees."  *Burlington* [*N. & Santa Fe Ry. Co. v. White*], 548 U.S. [53, 63 (2006)].  Title VII thus prohibits an employer from taking "materially adverse" action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity.

*Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011) (emphasis added).

Despite having the benefit of counsel at the time the operative complaint was filed, Shaham's retaliation claim is premised not on her engagement in protected activity, i.e., her EEOC complaints, but instead on an alleged request for reasonable accommodations.  The anti-retaliation provision of "Section 704(a) of Title VII provides protection for two distinct classes of employees: first, those opposing discrimination proscribed by the statute and second, those participating in Title VII proceedings."  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).  A request for reasonable accommodation for a disability amounts to neither opposing discrimination nor participation in a Title VII proceeding.  So it is not "protected activity" under Title VII.  Indeed, even if she had submitted evidence that she had opposed disability discrimination, this would not be protected activity under Title VII, which does not prohibit disability discrimination.  *See, e.g.*, *Risco v. McHugh*, 868 F. Supp. 2d 75, 111 (S.D.N.Y. 2012) (finding that "a complaint about disability-related discrimination cannot form the basis of a retaliation claim under Title VII").

3.      **ADA Discrimination (Count One)**

Title I of the ADA provides that no employer "shall discriminate against a qualified

individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees…and other terms, conditions, and privileges of

employment."  42 U.S.C. § 12112(a).

Shaham alleges in her complaint that Vertrax discriminated against her, in violation of

the ADA,

> by terminating her employment while she [w]as out of work on FMLA; by failing to offer
> Shaham an alternative position, even though she had been given clearance to return to
> work with no restrictions; and by forcing Shaham to apply for open positions as a new
> applicant to be considered with other outside candidates, and to begin the employment
> process all over again, even though she was qualified for said open positions and other
> employees, who were also laid off, were offered similar positions within the company
> and did not have their employment terminated and did not have to re-interview or re-
> engage in the hiring process.

ECF No. 16 at ¶ 40.  I construe these allegations as raising both a failure to accommodate and a

disparate treatment theory of liability, and discuss each theory in turn below.  *See, e.g.*, *Woolf v.*

*Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (articulating both theories); *Wanamaker v. Westport Bd.*

*of Educ.*, 899 F. Supp. 2d 193, 209 (D. Conn. 2012) (concluding that "[a]s it is unclear what type

of ADA claim Plaintiff is raising, the Court will examine the sufficiency of the pleadings with

respect to both types of claims.").

As with Title VII claims, "[c]laims alleging disability discrimination in violation of the

ADA are subject to the burden-shifting analysis originally established by the Supreme Court in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."

*McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009).

A plaintiff satisfies her initial burden and

> makes out a prima facie case of disability discrimination arising from a failure to
> accommodate by showing each of the following: (1) [P]laintiff is a person with a

24

disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*McBride*, 583 F.3d at 96–97 (internal quotation marks omitted).  In order to establish a prima facie case of disparate treatment based on adverse employment action, a plaintiff must show that "(1) the employer is subject to the ADA; (2) the plaintiff is disabled within the meaning of the ADA or perceived to be so by her employer; (3) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (4) she suffered an adverse employment action; and (5) the adverse action was imposed because of her disability." *Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015).  Unlike Title VII, however, "the ADA requires a plaintiff alleging a claim of employment discrimination to prove that discrimination was the but-for cause of any adverse employment action."  *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019).

a.      **Disparate Treatment**

Vertrax argues that summary judgment is warranted because "Plaintiff cannot establish the second, third and fourth prongs of a prima facie case of employment discrimination in violation of the ADA."  ECF No. 42-1 at 10.  In the alternative, Vertrax contends that "even if…Plaintiff has established the prima facie elements of ADA discrimination, [it] has demonstrated a legitimate, nondiscriminatory reason for the [adverse] employment action."  *Id.*

As to the second element of Shaham's prima facie case, the Defendant is correct that the conclusory assertion in Shaham's complaint that she "suffers from cancer and brain encephalopathy, as well as other medical conditions and informed Vertrax on numerous occasions of those diagnoses," ECF No. 16 at ¶ 21 is insufficient, on its own, to establish that she is a "person with a disability."  *See* ECF No. 47 at 11-12.  Nonetheless, the medical records

submitted by Plaintiff detailing what appear to be serious medical conditions suggest that Shaham would be able to present some or all of this evidence in an admissible form at trial to establish that she suffered from a serious impairment.  And while she does not put forth detailed evidence that such an impairment substantially limited a major life activity, 42 U.S.C. §§ 12102(1), I will assume without deciding that Shaham's medical evidence is adequate to show that she is disabled within the meaning of the ADA. As discussed below, however, this does not mean that Vertrax was aware she was disabled.

At the second stage, Vertrax has sufficiently met its burden to "proffer a legitimate, non-discriminatory reason for its actions in order to rebut the presumption of unlawful discrimination." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998).  Specifically, Vertrax contends that "Plaintiff failed to communicate with Vertrax for six months and failed to provide the medical documentation Vertrax requested regarding Plaintiff's need for leave and her alleged inability to return to work."  ECF No. 42-1 at 15.  So, Vertrax asserts, "Plaintiff's complete failure to communicate and to provide the requested medical documentation after repeated requests led to Vertrax's legitimate and non-discriminatory decision to terminate the Plaintiff's employment."  *Id.*

The undisputed evidence reveals that despite expressing an intent to return to work and to provide Vertrax with a "time frame" for her return "as soon as" her physicians could provide it to her, ECF No. 46-10 at 5, and despite receiving an email from Vertrax requesting the proffered "information concerning [her] ability to return to work once [she had] an update from [her] physician" by July 1, 2020, ECF No. 46-10 (Pl. Ex. K) at 6; *see also* Def. L.R. 56(a)(1) Stmt. ¶ 33—to which she responded with a confirmation that she would provide the requested

information—Shaham failed to provide any further update as to her anticipated return to work before she was terminated, Def. L.R. 56(a)(1) Stmt. ¶ 34.

Vertrax's assertion that Shaham was terminated because she failed to communicate with Vertrax for nearly six months regarding her planned return to work is sufficiently supported by the record. And Shaham has not put forth evidence that Vertrax's "proffered explanation is merely a pretext for its intentional discrimination." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998), or otherwise shown that discrimination was a motivation for her termination. For example, she points to no evidence that anyone at Vertrax harbored animus against her on the basis of her alleged disability, no evidence that other similarly-situated employees, i.e., those who had exhausted their sick leave and vacation time but were not disabled, were treated differently, and no evidence that a non-disabled person was hired to replace her. I therefore grant summary judgment to Vertrax on Shaham's disparate treatment claim.

**b.     Failure to Accommodate**

Plaintiff articulates her failure-to-accommodate claim in her complaint as follows:

> [B]y *failing to offer Shaham an alternative position*, *even though she had been given clearance to return to work with no restrictions*; and by forcing Shaham to apply for open positions as a new applicant to be considered with other outside candidates, and to begin the employment process all over again, even though she was qualified for said open positions and other employees, who were also laid off, were offered similar positions within the company and did not have their employment terminated and did not have to re-interview or re-engage in the hiring process.

ECF No. 16 at ¶ 40 (emphasis added). I grant summary judgment to Defendant on this theory as well, as there is no evidence in the record that Shaham made a request for either of the accommodations arguably alleged in her complaint—that she be offered an alternative position, or that she be offered her original position "with no restrictions."

The undisputed evidence in the record shows only that Shaham communicated to Vertrax (1) her intent to return to work; and (2) her intent to provide Vertrax with information from her physicians as to the time frame of her return. *See* ECF No. 46-10 (Pl. Ex. K) at 6; *see also* Def. L.R. 56(a)(1) Stmt. ¶¶ 33-34. The record nowhere suggests that Shaham requested from Vertrax accommodation in the form of "an alternative position;" that she had been "given clearance to return to work with no restrictions;" or that she communicated to Vertrax that she had been cleared to return to work.[33] Shaham has submitted no evidence to substantiate any of these claims. The record instead establishes that, after promising in June 2020 to provide information from her physicians to Vertrax regarding her ability to return to work, Shaham failed to provide any update in this regard before she was terminated nearly six months later. *See* Def. L.R. 56(a)(1) Stmt. ¶¶ 34-35.[34] I therefore cannot conclude that Shaham ever requested the specific accommodations alleged in her complaint or that Vertrax denied those requests, and I proceed to consider whether, even in the absence of evidence of these accommodation requests ever being made, Vertrax nevertheless owed Shaham a duty to reasonably accommodate her because her disability was "obvious" to the company.

"[G]*enerally,* it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (emphasis in original) (internal quotation marks omitted). The Second Circuit has held, however, that even when an employee fails to inform her employer that an accommodation

_____

[33] Neither does the record indicate that Vertrax "forc[ed] Shaham to apply for open positions as a new applicant…." ECF No. 16 at ¶ 40.

[34] Plaintiff claims that she stopped communicating with Vertrax not out of neglect but due to a June 16, 2020 email from Vertrax's counsel "commanding" her not to communicate with the company. ECF No. 46 at 20. The email, which Plaintiff has submitted, does indeed instruct her to cease "any further communications with anyone at Vertrax" about her claims, but it also directs her to send "[a]ny further communications concerning these claims" directly to Vertrax's counsel. ECF No. 46-9 at 13. Plaintiff does not suggest she made any effort to communicate with counsel or to provide him with information about her ability to return to work.

is needed, "an employer has a duty reasonably to accommodate an employee's disability if the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled." *Id.* If the disability is obvious, an employer must "engage in an 'interactive process' with their employees and in that way work together to assess whether an employee's disability can be reasonably accommodated." *Id.* (internal quotation marks and alteration omitted).

Unlike in *Brady*, the record here does not establish that Shaham's disability was obvious to Vertrax. For one thing, there is no indication that any of the medical records contained in Shaham's summary judgment submissions were ever provided to Vertrax. The record suggests that Shaham provided Defendants with only the following information regarding her medical conditions: (1) the March 27, 2020 email from Plaintiff to certain Vertrax employees "disclosing information about her alleged health conditions, specifically her 'encephalopathy,'" Def. L.R. 56(a)(1) Stmt. ¶ 16; (2) the April 3, 2020 email from Plaintiff "referencing the 'encephalopathy of [her] brain,'" Def. L.R. 56(a)(1) Stmt. ¶ 20; Pl. L.R. 56(a)(2) Stmt. ¶ 20; and (3) the April 7, 2020 "mass email" to her colleagues at Vertrax disclosing that she was 'experiencing symptoms of the COVID-19 virus along with having cancer' and that she was 'being tested for the virus via our drive-up testing provided here by the County and CDC,'" Def. L.R. 56(a)(1) Stmt. ¶ 21; Pl. L.R. 56(a)(2) Stmt. ¶ 21. These disclosures are far from sufficient to establish that Vertrax knew or should have known that Shaham was disabled—they are conclusory, lacking in context, and not supported by any diagnosis from a physician. Also relevant to this inquiry is the fact that after "advis[ing] Vertrax that she was being admitted to MD Anderson Cancer Hospital in Houston Texas and that she would provide the doctors' confirmation and status when they are able to provide it," "[s]he never provided this information," and failed to communicate with

Vertrax about her health situation or ability to return to work for "nearly six months, from June 10 to December 2, 2020." Def. L.R. 56(a)(1) Stmt. ¶¶ 34-35.

"An employee's provision of medical information is an indispensable aspect of that interactive process and where an employee fails to provide documentation sufficient to allow an employer to assess the parameters of the employee's disability, 'ADA liability simply does not follow.'" *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 579 (S.D.N.Y. 2008) (quoting *Beck v. University of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir.1996)); *see also Brady*, 531 F.3d at 135 ("[A]n employer who acts or fails to act without knowledge of a disability cannot be said to have discriminated based on that disability.") (quoting *Felix v. New York City Transit Authority*, 154 F.Supp.2d 640, 657 (S.D.N.Y. 2001)). Shaham has failed to submit evidence of a request she made for reasonable accommodation or, in the alternative, evidence sufficient to establish that Vertrax knew or should have known she was disabled. Further, as Vertrax notes, "it is undisputed that Vertrax provided a reasonable accommodation for Plaintiff's alleged disabilities in the form of paid and unpaid leave for nearly one year." ECF No. 42-1 at 14. So even if Vertrax was aware of her disability, it took reasonable steps to accommodate her by keeping her job open for a year and paying her for a portion of that period, even though neither the FMLA, which does not apply to employers with fewer than 50 employees, 29 C.F.R. § 825.104(a), nor any internal leave policy required Vertrax to do so. Consequently, I find that Vertrax is entitled to summary judgment on her failure to accommodate claim as well.

**4.     ADA Retaliation (Count Two)**

Under the ADA, it is unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or

because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  A claim of retaliation is analyzed under the *McDonnell Douglas* burden-shifting framework.  *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002).  "In order to establish a prima facie case of retaliation, [a plaintiff] must show that: (1) [s]he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against h[er]; and (4) a causal connection exists between the alleged adverse action and the protected activity."  *Treglia*, 313 F.3d at 719.  "A plaintiff's burden at this prima facie stage is *de minimis*."  *Id.*

Vertrax challenges the sufficiency of Shaham's evidence as to all four elements.  *See* ECF No. 42-1 at 16.  I start with the first element, which looks to whether Shaham was engaged in protected activity under the ADA.  Shaham's retaliation claim asserts that Vertrax "retaliated against her for the disabilities for which she suffered, and for which she was out of work on FMLA."  ECF No. 16 at ¶ 43.  There are two problems with this assertion.  First, it does not articulate a cognizable ADA retaliation claim because it does not suggest she suffered from an adverse employment action as a result of activity aimed at opposing ADA discrimination.  Second, Shaham has not established, and the record does not support, that she was on a leave of absence under the FMLA.  In fact, her own evidence suggests that Vertrax was too small an employer to be covered by the FMLA.  *See* ECF No. 37-1 at 12 (noting Vertrax had 35 full-time and full-time-equivalent employees); 29 C.F.R. § 825.104(a) (employer covered by FMLA if it has 50 or more employees).  That the nature of the alleged protected activity supporting Shaham's retaliation claim is unclear is sufficient to warrant granting summary judgment to Vertrax.  *See Brizzi v. Utica Mut. Ins. Co.*, 529 F. Supp. 3d 44, 56 (E.D.N.Y. 2021) (finding that

defendant was entitled to summary judgment where "it [was] unclear from the amended

complaint what [plaintiff] maintains constituted a protected activity to make out a prime facie

retaliation case.").

  The record does include evidence that Plaintiff filed a complaint with the Ohio Civil

Rights Commission (apparently because Vertrax was headquartered there) asserting

discrimination on the basis of disability and national origin, as well as "harassment," but there is

no evidence that this complaint, which was dismissed on jurisdictional grounds, was forwarded

to Vertrax.  *See* ECF No. 46-9 at 15-20.  There is also evidence that Vertrax was notified that

Plaintiff had filed a complaint with the Connecticut Commission on Human Rights and

Opportunity ("CHRO"), *see id.*, but there is nothing in the record showing the content of that

complaint, including whether it asserted disability discrimination, or that Vertrax was aware of

its content.  It thus does not appear that Shaham has introduced any evidence suggesting that

Vertrax was aware that she opposed disability discrimination.

  In any event, even if I were to assume that Shaham has set forth a prima facie case of

retaliation, Vertrax has set forth a legitimate business reason for terminating her, as already

shown with respect to her Title VII claim, i.e., it terminated her because she failed to

communicate with the company for an extended period and never provided medical evidence

regarding her ability to return to work.  And, as with Shaham's Title VII claim, I find that she

has failed to establish a retaliation claim because she has not shown that the reason given by

Vertrax for her termination is both "false, *and* that [retaliation] was the real reason."  *St. Mary's

Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

  The record reveals that Shaham went out on leave beginning January 24, 2020, using, and

eventually exhausting, the vacation days she had accrued.  Def. L.R. 56(a)(1) Stmt. ¶ 1.  Vertrax

32

then decided that it "would allow Plaintiff to take a leave of absence and Vertrax would continue to pay Plaintiff her full salary while assisting her in applying for short-term disability benefits." Def. L.R. 56(a)(1) Stmt. ¶ 11.  The parties worked from around March 2020 to April 2020 to get her short-term disability claim approved by UHC.  *See id.* at ¶¶ 13-18.  Throughout this same period, Shaham sent four separate emails to Vertrax employees between February and April 2020 discussing the health conditions she claimed she was suffering from.  Def. L.R. 56(a)(1) Stmt. ¶¶ 12, 16, 20-21; Pl. L.R. 56(a)(2) Stmt. ¶ 20.  In June, Vertrax requested information regarding Shaham's plans to return to work.  Def. L.R. 56(a)(1) Stmt. ¶¶ 30, 33.  Shaham indicated in response that she would follow up with Vertrax about her return to work after she received information from her doctor, but ultimately did not communicate with Vertrax further on that subject.  *Id.* at ¶¶ 34-36.

Even if I were to credit Shaham's unsupported claim that she provided Vertrax with information regarding her upcoming "tumor removal [and] reproductive organ surgery" "in early June 2020," Pl. L.R. 56(a)(2) Stmt. ¶ 33, no reasonable juror could infer from this evidence that her termination was motivated by a desire to retaliate against her for filing a disability discrimination claim.  A communication in June about a medical procedure does not excuse the failure to update Vertrax about her condition and her ability to return to work for the ensuing six months.  Her claim thus does not suggest that Vertrax's rationale for terminating her was pretextual.  Further, Plaintiff points to no other indications of retaliatory intent in the record.

Finally, although neither Plaintiff's complaint (which was drafted by counsel) nor her summary judgment papers address this issue, I will briefly address the timing of Plaintiff's termination relative to her filing of the CHRO complaint.  As noted, there is no evidence in the record that Vertrax was aware that that complaint included a disability discrimination claim, but

I will assume for these purposes that it was.  Plaintiff notified Vertrax on June 9, 2020, that she had filed a complaint with the CHRO, ECF No. 46-9 at 15, and she was terminated six months later.  While a 6-month interval between protected activity and adverse action is enough to show a prima facie case of retaliation, it is not enough by itself to show pretext or that the real reason for the adverse action was retaliation.  *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) ("Though five months might be enough to establish a prima facie case, temporal proximity alone is not enough to establish pretext in this Circuit.").  In short, Shaham has "failed to demonstrate that [Vertrax's] actions were pretextual," *Francis v. Hartford Bd. of Educ., City of*, 760 F. App'x 34, 37 (2d Cir. 2019), which is an essential element of her retaliation claim.  I thus grant summary judgment to Vertrax as to Shaham's ADA retaliation claim.

5.      **Negligent Infliction of Emotional Distress (Count Three)**

        To prevail on a claim of negligent infliction of emotional distress under Connecticut law, a plaintiff must prove that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm."  *Parsons v. United Techs. Corp., Sikorsky Aircraft Div.*, 243 Conn. 66, 88 (1997) (internal quotation marks omitted).  In the employment context, liability for negligent infliction of emotional distress "arises *only* where it is based upon unreasonable conduct of the defendant in the termination process.  The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress."  *Id.* at 88–89 (emphasis added) (internal citation and quotation marks omitted).  The pertinent question is "whether the defendant's conduct during the termination process was *sufficiently wrongful* that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were

caused, might result in illness or bodily harm." *Perodeau v. City of Hartford*, 259 Conn. 729,

751 (2002) (emphasis in original) (internal quotation marks omitted).

Shaham argues that Vertrax "knew or should have known that its conduct in subjecting

the plaintiff to a hostile work environment[35] [created] an unreasonable risk of causing severe

emotional distress to the plaintiff and that such distress might result in illness or bodily harm and

terminating her in the manner herein." ECF No. 16 at ¶ 48. Neither this assertion nor the

allegations in the complaint offered in support of the assertion—such as the failure to invite her

to the office Christmas party, ECF No. 16 at ¶¶ 22-23; the release of her "confidential medical

information," *id.* at ¶ 24; "harass[ment]" from Lampel regarding her medical information, *id.* at ¶

27; and not being sent to train her clients because she was "a girl," *see id.* at ¶ 32—concern

Vertrax's "conduct during the termination process," the only conduct relevant to a negligent

infliction of emotional distress claim in the employment context. As the Connecticut Supreme

Court has explained, an employer "may not be found liable for negligent infliction of emotional

distress arising out of conduct occurring within a continuing employment context, as

distinguished from conduct occurring in the termination of employment." *Perodeau v. City of*

*Hartford*, 259 Conn. 729, 762–63 (2002). So Shaham's allegations concerning Vertrax's pre-

termination conduct do not support her negligent infliction of emotional distress claim.

For its part, Vertrax has submitted evidence that:

Plaintiff was terminated on December 4, 2020, after a nearly year-long leave of absence
and after she failed to provide Vertrax documentation from [her] physician regarding her
claimed entitlement to leave and her ability to return to work. Vertrax originally asked
for this information no later than July 1, 2020. Plaintiff failed to provide the information
and failed to communicate with Vertrax whatsoever. On December 4, 2020, after not

---

[35] Shaham does not allege a freestanding hostile work environment claim in her complaint, but even if she did, it
would fail on this record. She points to no evidence of harassing conduct of sufficient severity or sufficient
frequency to satisfy the requirement that the conduct be "severe or pervasive enough to create an objectively hostile
or abusive work environment." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks
omitted).

hearing from Plaintiff since June about Plaintiff's need for continued leave or her ability to return to work, Vertrax emailed Plaintiff a termination letter.

ECF No. 42-1 at 20 (internal citations omitted).  This evidence, which Plaintiff has failed to contradict with opposing evidence, does not suggest that any unreasonable conduct occurred in the termination process.  It is reasonable to expect that an employee who has been absent for a year and who is not entitled to further leave will respond in less than 6 months to her employer's requests for medical records and information on her ability to return to work.  Accordingly, I grant summary judgment in favor of Vertrax as to Shaham's negligent infliction of emotional distress claim.

**6.    Negligent Misrepresentation (Count Four)**

Under Connecticut law, "[t]raditionally, an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result."  *Coppola Const. Co. v. Hoffman Enterprises Ltd. P'ship*, 309 Conn. 342, 351–52 (2013) (internal quotation marks omitted).

As Vertrax contends, Shaham's negligent misrepresentation claim "rests solely on her allegation that Vertrax failed to follow its policy of providing a reasonable accommodation for her alleged disability."  ECF No. 42-1 at 21.[36]  Vertrax's policies,[37] Shaham contends, "required that it consider Shaham's requests for accommodation and take reasonable steps to accommodate h[er] disability."  ECF No. 16 at ¶ 54.  As discussed above, however, there is no evidence that

---

[36] I assume without deciding that a statement of an employer's policy, i.e., what it will or will not do in the employment relationship under particular circumstances, is a statement of fact for purposes of a negligent misrepresentation claim.

[37] I assume that such policies – which do not appear in the record – existed, as neither party contends otherwise.

Shaham made a request to accommodate a disability in the form of any type of request that she be allowed to return to work under modified work conditions. When the record is construed generously in Shaham's favor, it arguably shows that she made a request for accommodation for her disability in the form of a request for continued leave from her employment. The undisputed evidence establishes, however, that Vertrax provided Shaham with the accommodation she requested, allowing her to take a paid and unpaid leave of absence from her position for almost an entire year. When asked for a status update regarding her continued need for leave—almost six months into her leave, and after Vertrax had assisted her in applying for short-term disability coverage and paid her full salary for several months—Shaham failed to provide Vertrax with any of the information it was seeking or otherwise communicate with Vertrax about her ability to return to work for six months. Because Vertrax reasonably accommodated Shaham's request for leave, Shaham cannot establish that Vertrax made a misrepresentation with respect to its accommodation policy. Vertrax is therefore entitled to summary judgment on Shaham's negligent misrepresentation claim.

**B.      Plaintiff's Motion**

Defendant first opposes Shaham's summary judgment motion on the procedural ground that she failed to file a Local Rule 56(a)(1) Statement in support of her motion, arguing that "[t]his noncompliance is grounds for dismissal" pursuant to Local Rule 56(a)(3). ECF No. 45 at 2. Shaham's motion lacks not only a statement of facts, but also a memorandum of law, which Local Rule 56(a)(1) implies must be filed along with a summary judgment motion. *See* D. Conn. L.R. 56(a)(1) (stating that "[a] party moving for summary judgment shall file and serve *with the motion and supporting memorandum*" a Rule 56(a)(1) statement) (emphasis added).

As for its substance, Shaham's motion differs from the conclusory allegations and the documents submitted in support of her opposition to Defendant's motion only in that it offers additional medical records not included with her opposition submissions.  These medical records, which have not been submitted in an admissible form, provide additional information regarding the medical conditions she was suffering from and the various procedures she underwent to address them.  *See generally* ECF No. 37-1.  Even if I was to rely on the representations made in these records as to her medical conditions, they do not add significantly to her arguments, show that she is entitled to judgment as a matter of law on any of her claims, or raise genuine disputes of material fact in opposition to Defendant's motion.

For these reasons, I adopt my ruling on Defendant's motion here and deny Shaham's motion.

## V.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED and Shaham's motion for summary judgment is DENIED.  The Clerk is instructed to close this case. IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:         Hartford, Connecticut
               March 22, 2023